**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN NATIONAL INSURANCE | ) | |
| COMPANY, a Texas corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| JIMMY NELSON, AS EXECUTOR | ) | |
| OF THE ESTATE OF ALVIN O'NEAL | ) | |
| DONE, AND PETE JOSEPH COSTELLO, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff American National Insurance Company ("American National"), by and through undersigned counsel, files this Complaint against Defendants Jimmy Nelson ("Nelson"), as Executor of the Estate of Alvin O'Neal Done, and Pete Joseph Costello ("Costello," collectively, "Defendants"), pursuant to 28 U.S.C. § 2201, *et seq.* In support of its Complaint, American National states as follows:

## **INTRODUCTION**

1. American National seeks a judgment declaring American National life insurance policy no. U0955066 (the "Policy") unenforceable and void *ab initio* against public policy because: (1) the Policy is a wagering contract, obtained in bad faith, in violation of the rule against wagering contracts, and (2) the Policy is void *ab initio* as an illegal contract procured in violation of various state and federal statutes, including the Racketeer-Influenced and Corrupt Organization

1

Act ("RICO"); (3) Defendants have violated RICO, (4) Defendants have conspired to violate RICO, and (5) Defendants have committed fraud against American National.

## PARTIES

2.      American National is a Texas corporation with its principal place of business in Galveston, Texas.

3.      Defendant Jimmy Nelson, as Executor of the Estate of Alvin O'Neal Done, is an individual that resides in Memphis, Tennessee, and is a citizen of the State of Tennessee. The administration of the Estate of Alvin O'Neal Done is currently pending in Cause No. PR-028115-I in the Probate Court of Shelby County, Tennessee.

4.      Defendant Pete Joseph Costello is an individual that resides in Lake Cormorant, Mississippi, and is a citizen of the State of Mississippi.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties to this cause of action and the amount in controversy exceeds $75,000. Jurisdiction is also proper pursuant to 28 U.S.C. § 1331 because American National's RICO claims against the Defendants, brought under 18 U.S.C. § 1962, arise under federal law.

6.      This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1397, because the conduct in question in this dispute was part of a proven conspiracy to violate the federal Racketeer-Influence Corrupt Organizations ("RICO") Act, which occurred in this District.

## STATEMENT OF FACTS

7.      Upon information and belief, Nelson is Costello's father-in-law.   Costello is married to Caroline Marie Nelson, who, upon information and belief, is Nelson's daughter.   Based upon investigation into the Irish Traveler Community, the insurance policy and claim involved in this litigation was used as a sort of dowry to secure the marriage of Caroline Nelson and Costello. The policy was taken out on the life of Alvin O'Neal Done, Nelson's "helper," in whose life none of the three persons identified in this paragraph had any insurable interest.

**A.      The Irish Traveler Insurance Conspiracy.**

8.      Murphy Village is a small community located in North Augusta, South Carolina with approximately 2,000 residents who self-identify as "Irish Travelers."

9.      Murphy Village was the epicenter of a Federal Bureau of Investigation ("FBI") investigation of racketeering and various forms of mail fraud, wire fraud, government benefits fraud, life insurance fraud, and other financial crimes among certain Irish Travelers living in Murphy Village, and persons affiliated with them (the "Investigation"). *See* Declaration of Ron Grosse, ¶ 3, 10-16, attached hereto as **Exhibit 1**.

10.      The Investigation uncovered efforts by certain members of the Irish Traveler Community in Murphy Village, persons affiliated with those Irish Travelers there and elsewhere, and life insurance agents to defraud life insurance companies (the "Conspiracy").   *Id.*   The Conspiracy spanned a number of years and involved defrauding life insurance companies by knowingly submitting applications and forms containing false information and intentionally omitting material information, in addition to procuring policies with the premeditated intent to sell, barter, and trade those policies to persons lacking an insurable interest, in violation of the rule against wagering contracts.  *Id*.

11. The Conspiracy included thousands of life insurance policies fraudulently procured from various insurance companies. *Id.* ¶ 10. At the time of the Investigation, at least $535,000,000 dollars' worth of life insurance policies had been applied for by persons in Murphy Village. *Id.*

12. Under the Conspiracy, life insurance policies were obtained by submitting fraudulent applications that contained material misrepresentations of fact to obtain higher coverage amounts, such as grossly misrepresenting the insured's income, net worth, employment status, health condition, and the amount of existing life insurance coverage on the insured. *Id.* ¶ 12. The misrepresentations were designed to induce insurance companies into issuing policies of life insurance, often at higher coverage amounts than the applicant might qualify for, if they qualified at all. *Id.* It was common practice for members of the enterprise to seek out and obtain multiple life insurance policies on persons who had serious health conditions without disclosing the nature and extent of the applicant's health. *Id.*

13. The Investigation found that participants in the Conspiracy were familiar with restrictions prohibiting persons from taking out policies on persons in whom they lack an insurable interest in the applicable policies. *Id.* ¶ 14. The participants employed several different schemes to evade this rule. *Id.* One of the more common schemes involved procuring a policy with the express intent that it would be paid for, controlled by, and later transferred to an unrelated third party with no insurable interest in the insured. *Id.* The characteristics of this scheme were typically as follows:

    a. An application is submitted to the insurance company that misrepresents the net worth, income, employment status, health, and contact information for the insured. In the application, the named beneficiary is either: (1) a person represented as having an insurable interest by virtue of their relationship with the insured, e.g., spouse, parent, or child; or (2) a person who by virtue of their relationship with the insured lacked an insurable interest.

b.      From its inception, the policy premiums are paid by a third party, unrelated to the insured and who lacks an insurable interest, but for whom and to whom the insured procured the policy with the intent to transfer.

c.      Either: (1) the policy application lists the third party's address and/or phone number as that of the insured; or (2) a request is submitted to the insurance company after the policy is procured that the insured's address and phone number be changed to that of the third party. This ensures the third party controls all correspondence with the insurance company regarding the policy.

d.      A change-of-beneficiary form is submitted to the insurance company naming as the beneficiary the unrelated third party who paid the premiums from the policy's inception. To create the illusion of an insurable interest, this form falsely identifies the third party as a relative to the insured, most often a "cousin," "nephew," "niece," or "in law."

e.      A change-of-ownership form is submitted to the insurance company transferring ownership of the policy to the unrelated third party who paid premiums from the policy's inception. To create the illusion of an insurable interest, this form also falsely identifies the third party as a relative to the insured, most often a "cousin," "nephew," "niece," or "in law."

f.      Often, the forms identified in items (d) and (e) are executed on the same day but submitted later and separately in order not to draw attention to the submissions.

g.      In some cases, the premium payor recruits other unrelated persons to help pay policy premiums with the promise that these other payors will receive some of the death benefits under the policy.

h.      In some cases, the policy is sold to other unrelated persons who take over premium payments.

*Id.* ¶ 14.

14.     The Investigation showed participants in the Conspiracy often owned and/or were beneficiaries of several policies. *Id.* ¶ 15.

**B.      The Investigation resulted in the conviction of at least 52 co-conspirators under RICO, including life insurance agent Leonard New.**

15.     The Investigation resulted in criminal charges filed against 52 self-identified "Irish Travelers" in Murphy Village and others affiliated with the Irish Traveler Community, including insurance agent Leonard New ("New").

16.     On August 8, 2016, former life insurance agent New and twenty-one others were indicted on forty-five criminal counts, filed in the United States District Court for the District of South Carolina, Aiken Division in *U.S. v. Hannah Carroll, et al.*, No. 1:16-cr-632, ("RICO Indictment").  Count 1 of the criminal RICO case charged New and his co-conspirators with Conspiracy to Commit Racketeering in violation of 18 U.S.C § 1962(d).  The RICO Indictment in *U.S. v. Hannah Carroll, et al.*, No. 1:16-cr-632 ("Criminal Case") is attached and incorporated herein as **Exhibit 2**.

17.     New and the other twenty-one named defendants were charged with being part of a RICO "Enterprise," defined by 18 U.S.C. § 1961(4) as: "an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objective of a criminal Enterprise." Ex. 2, RICO Indictment, ¶ 3.  As noted in the RICO Indictment, one of the Enterprise's purposes was to "[e]nrich[] the members and associates of the Enterprise through defrauding insurance companies." *Id.* ¶ 4C.

18.     Specifically, the RICO Indictment provided that:

> Members and associates of the Enterprise defrauded life insurance companies by submitting false and fraudulent information regarding the insured's health and financial status on insurance applications or allowed others to submit false and fraudulent information regarding the insured's health and financial statues on insurance applications. In some instances, members and associates of the Enterprise obtained life insurance policies on other members and associates of the Enterprise, and they often misrepresented their relationship to the insured, as well as the health of the insured, on the insurance applications. Members and associates of the Enterprise sent or allowed co-conspirators to send the applications for life insurance via the U.S. mail and interstate wires for the purpose of executing the scheme to defraud.

Ex. 2 at ¶ 8d.

19.     On March 3, 2017, New pled guilty to Count 1 of the Indictment (the "New Plea"). The New Plea is attached and incorporated as **Exhibit 3.**

20.     On January 14, 2019, a judgment in the Criminal Case was entered against New (the "New Judgment").  The New Judgment is attached and incorporated as **Exhibit 4**.  The New Judgment sentenced New to 24 months in prison with two years of supervised release and ordered that New pay restitution and forfeit all proceeds of the Conspiracy.

21.     As part of the New Plea, New agreed to cooperate with the FBI in its Investigation into the Conspiracy.  *See* **Exhibit 5**, New Affidavit at ¶ 5.  New worked directly with FBI Special Agent Ron Grosse and provided him and other federal agents with information that assisted the government in bringing claims against other members of the Conspiracy. *Id.*

22.     Much of the information New provided to the FBI was included in Section II(A) of the United States' Sentencing Memorandum submitted in many, if not all, of the Irish Traveler RICO cases and the subsequent related criminal conspiracy cases.  The United States' Sentencing Memorandum is attached hereto as **Exhibit 6**.

23.     New has since admitted: "Essentially every policy I helped procure for persons in the Irish Traveler community . . . was part of the RICO life insurance fraud scheme[.]" *See* Ex. 5, New Affidavit at ¶ 13.

24.     New's assistance resulted in subsequent criminal conspiracy charges against twenty-five other "Irish Travelers" as well as other life insurance agents engaged in the Conspiracy, filed in the United States District Court for the District of South Carolina, Aiken Division on August 22, 2017, in *U.S. v. John U. Carroll, et al.*, No. 1:17-cr-777, and on October 17, 2017, in *U.S. v. Douglas Wade Williamson*, No. 1:17-cr-987.  A true and correct copy of the

Information in *US.* v. *John U Carroll, et al.,* CR. No. 1: 17-cr-777, is attached and incorporated as **Exhibit 7**.

**C      Memphis, Tennessee is the situs of another pod of Irish Travelers.**

24.     The Irish Travelers are not exclusive to Murphy Village, nor is their insurance conspiracy.  *See* Ex. 1, Grosse Declaration, at ¶¶ 17-22. Many of the same families, known by the same surnames, took out life insurance policies in and around Memphis, Tennessee, some through the same insurance agent, Leonard New. *Id*. at ¶ 19. The Irish Traveler community in Memphis, Tennessee, is almost exclusively located in the Oakhaven Mobile Home Park. *Id*. at ¶ 18.

25.     In fact, the Costello family residing in the Oakhaven Mobile Home Park has been involved in the procurement of at least one other American National Life Insurance Policy on a person in whom they lacked an insurable interest procured by Leonard New and in furtherance of the Irish Traveler Insurance Conspiracy.

26.     Specifically, American National obtained a judgment in a lawsuit involving allegations that Annie M. Costello, a self-identified "Irish Traveler," procured a policy on the life of a man in whom she lacked any insurable interest with the assistance of Leonard New, which:

    a.   provided her own address of 4507 Arose Lane, Memphis, Tennessee, as the Insured's address, despite the Insured's driver's license listing another;

    b.   listed her own phone number and the Insured's phone number; and

    c.   was paid for entirely by premium payments mailed from her address and a P.O. Box belonging to her located in Nesbit, Mississippi.

27.     American National rescinded this policy on the basis that it was a wagering contract obtained in bad faith and in violation of the rule against wagering contracts, and it was void *ab initio* as an illegal contract procured in violation of various state and federal statutes, including RICO.

D.    **Policy No. U0955066 (the "Policy")**

28.    Defendants are individuals who, as discussed below, improperly procured, maintained, controlled, and funded, a wagering life insurance policy on the life of Alvin O'Neal Done ("Done" or "Insured"), despite a lack of insurance interest in his life.

29.    Alvin Done was not an "Irish Traveler" but one of several community outsiders who were recruited and/or used, unknowingly, by RICO conspirators for purposes of obtaining wagering life insurance policies for personal financial gain.  Upon information and belief, Done was destitute most of his life and worked as a painter for Nelson, relying entirely on Nelson for transportation, housing, and food.

30.    Nelson is, upon information and belief, an Irish Traveler who resides in Memphis, Tennessee.  Costello is, upon information and belief, an Irish Traveler married to Mary Boswell a/k/a Mary Nelson, Caroline Marie Nelson, the daughter of Defendant Nelson. Neither Costello nor Nelson were related to Alvin Done.

31.    On November 30, 2015, Costello procured, with the assistance of Nelson and Leonard New, a life insurance policy on the life of Done.  The Application named the Insured's Estate as the beneficiary of the Policy.  The "Application" for Policy U0955066 is attached hereto as **Exhibit 8**.

32.    The Application contains material misrepresentations as to: (1) the Insured's annual income; (2) the Insured's net worth; (3) the Insured's employment status; (4) false identification of the Insured's employer address; and (5) whether the Insured suffered from any adverse health issues, including denying tobacco use, while his death certificate identifies "chronic tobacco use" as a contributing cause of his demise. The Application also incorrectly identifies the Insured's parents as Alvin Done, Sr., and Marnie Done.

33.     Unknown to American National, the Application misrepresented Done's home address and work address as 3177 Cap Drive, Memphis, TN 38118.  *Id.*  Upon information and belief, this address belongs to members of the Costello family, including Genevieve Costello, Tom Costello, Mary Ann Costello, Johnny Anthony Costello, and John Costello.  Upon information and belief, these persons are relatives of Pete Costello and his wife, Caroline Marie Nelson.  This misrepresentation was made so that Defendants would receive all correspondence related to the policy and thereby control all aspects of the policy.

34.     Furthermore, this address is located in the Oakhaven Mobile Home Park, very near the address belonging to Annie M. Costello (4504 Arose Lane, Memphis, TN), which was used to procure a similar ANICO policy on Steven Dunham, a person in whom she, like Pete Costello, lacked an insurable interest as discussed herein above:



35.     Unknown to American National, the Application listed Done's telephone number as \*\*\*-\*\*\*-2851.  *Id.*  Upon information and belief, this is the telephone number for Rose M. Boswell, aka Rose M. Nelson, Defendant Nelson's wife.  This misrepresentation, on information

and belief, was made so that Defendants would receive all telephone communications related to the policy and thereby control all aspects of the policy.

36.     On December 9, 2015, based on representations made in the Application, American National issued policy no. U0955066 (the "Policy") on the life of Alvin Done, in an amount of $250,000.

37.     From its inception, Costello and Nelson maintained total and exclusive control over the Policy.  Costello paid premiums on the Policy from an account in his own name at Regions Bank in Memphis, Tennessee.

38.     Costello sought the Policy for his own personal financial gain.  The Policy was procured at the request of Costello and Nelson, with the agreement that the Policy would be controlled by and paid for by Costello after it was procured for his benefit and personal gain in an effort to evade the rule against wagering contracts.

**E.     The Estate of Alvin Done.**

39.     American National first received notice of Done's death from Costello on October 4, 2022.  Costello filed an Online Life Claim Notification informing American National that Done had passed away on September 5, 2022. Costello's notification to American National instructed American National to send claim requirements to Costello.  Costello contacted American National on more than one occasion after Done's death, admitting the Policy was always intended for his benefit and purporting to be Done's uncle.

40.     It was not until February 5, 2024, that American National received the required Individual Life Claim Form from Jimmy Nelson, as Executor of the Estate of Alvin Done, ("Claimant"). The "Claim Form" for American National CB09441 is attached and incorporated as **Exhibit 9**.

41.     Nelson is the Executor of Alvin Done's Estate.  The Last Will and Testament of Alvin O'Neal Done (the "Will") is attached and incorporated as **Exhibit 10**.

42.     The Will, filed in the Probate Court of Shelby County, Tennessee, dated December 13, 2020, disposes specifically of the Policy, leaving it to Costello.  *Id*. at Article IV. One of the two witnesses to Done's Will appointing Nelson as Executor and leaving the Policy to Costello is Jimmy Nelson's mother, Mary Boswell.  *Id*.

43.     The Claim Form included a Certificate of Death from the State of Iowa for Alvin O'Neal Done.  *Id*.  The Death Certificate identified Done's address and place of death as 222 South Franklin Street, Manchester Iowa 52057.  *Id*.  The Death Certificate confirmed the correct names of Done's mother, Lena Jackson, and father, Cal Done, as well as identified Done's wife, Bonny Lou Brandenburg.  *Id*.  The cause of death was listed as cardiovascular disease with other significant conditions including chronic alcohol and tobacco use as well as high cholesterol.  *Id*. The Claim Form also included Letters Testamentary from Docket No. PR028115, State of Tennessee, County of Shelby County, empowering Nelson as Executor of Alvin Done's Estate. *Id*.

44.     Since the submission of the Claim Form, Costello has been the primary inquirer as to the status of the Claim, calling American National multiple times.  In one instance, he identified himself as Alvin Done's "uncle."  Claiming a false relationship between the third party and the insured is a common characteristic of the scheme employed in other Murphy Village conspiracies to defraud life insurance companies.  The difference here is that, rather than submitting a change-of-ownership form to transfer policy ownership to the unrelated and improper third party, Done's Estate was named as the beneficiary under the Policy, and Costello was later—by way of an improper Will—identified as the beneficiary of Done's Estate.

45.     Designation of the Estate as the beneficiary under the Policy does not cure the lack of an insurable interest in the life of Alvin Done because, on information and belief, the Policy was procured for the express purpose of benefitting person(s) who had no insurable interest in his life.

46.     Based on the foregoing, the Policy is an illegal wagering contract procured as part of the Irish Traveler Insurance Conspiracy.

47.     Considering Defendants' conduct alleged herein and fraudulent concealment, which required considerable and complex investigation, Plaintiff exercised reasonable diligence in discovering these claims. Any applicable limitations period are equitably tolled.

## CAUSES OF ACTION

### COUNT 1 – DECLARATORY JUDGMENT
### (Void *Ab Initio*, Wagering Contract)

48.     The allegations of the foregoing Paragraphs of this Complaint are realleged and incorporated as if set forth fully herein.

49.     The Federal Declaratory Judgment Act states:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

50.     A dispute regarding the validity of an insurance policy benefits presents proper grounds for declaratory judgment.  *See, e.g., Nationwide Affinity Ins. Co. of Am. v. Richards*, 439 F. Supp. 3d 1026, 1032 (W.D. Tenn. 2020) (citing *Certain Underwriters at Lloyd's v. Alkabsh*, No. 09-2711, 2011 WL 938407, at *1-2 (W.D. Tenn. Mar. 15, 2011).

51.     Under Tennessee law, an insurable interest[1] must exist at policy inception, or the policy will be void *ab initio*. *See* Tenn. Code Ann. § 56-7-101 ("A contract of insurance is an agreement by which one party, for a consideration, promises to pay money or its equivalent, or to do some act of value to the assured, upon the destruction or injury, loss or damage of something in which the other party has an insurable interest"); Tenn. Code Ann. § 56-50-102(6)(A)(iii) (prohibiting "entering into any agreement or undertaking any act or plan that involves stranger-originated life insurance", i.e. STOLI, defined as "a practice or an act to initiate a life insurance policy for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured."); Tenn. Code Ann. § 56-50-102(12)(A).

52.     For many years, Tennessee courts have held that life insurance taken out as a wager is void. *Sun Life Assurance Co. of Canada v. Conestoga Tr. Servs., LLC*, 263 F. Supp. 3d 695,701–02 (E.D. Tenn. 2017).  There is no insurable interest if a policy is procured as a "cover" for the wager.  *Id*.  A "telltale sign of such a scheme" is when a third party funds premium payments.  *Id*. Additionally, the transfer or assignment of a policy must be more than a "mere colorable evasion of the provision in regard to wagering contracts." *Id.*; *see also Peeler v. Doster*, 627 S.W.2d 936, 940 (Tenn. 1982) (holding that while an insured has an insurable interest on their own life and they can take out a policy on their own life and make it payable to a beneficiary without an insurable interest, if "the insurance is taken out and paid for by the beneficiary, he must have an insurable interest in the life of the insured, or the policy will be a mere wager policy, upon which the party to whom it was issued cannot recover").

---

[1] An insurable interest generally falls into one of two categories: (1) a "love and affection" insurable interest for persons closely related by blood or affinity; and (2) for all other persons, "a lawful and substantial economic interest in the continued life, health, and bodily safety of the person insured."  *Wagering on the Lives of Strangers: The Insurable Interest Requirement in the Life Insurance Secondary Market*, 50 Tort Trial Ins. Prac. L.J. 703 (2015).

53.     American National seeks a declaratory judgment that the Policy is unenforceable and void *ab initio* against public policy, insofar as the Policy is a wagering contract procured in bad faith in an attempt to evade the rule against wagering contracts.

54.     Defendants Nelson and Costello, on information and belief, induced Done to procure the Policy and name his Estate as beneficiary with the intention of further ensuring Alvin Done's Estate bequeathed the Policy to Costello.

55.     Costello was the "shadow owner" of the Policy and paid all premiums on the Policy since its inception. Alvin Done's Estate was listed as the beneficiary of the Policy to avoid directly identifying an unrelated third-party on the face of the Policy and create the illusion of an insurable interest.

56.     By naming Costello as the beneficiary of Done's Estate in a separate document (Done's Will and Testament), Costello attempted to invent a basis—one that is completely false since he has no insurable interest—to claim Policy proceeds.  This illusion is a variation of the typical scheme of transferring the Policy to an improper third-party through a change-of-ownership form, but it accomplishes the same illicit purpose.

57.     Costello controlled and paid for the Policy from its inception, despite his lack of an insurable interest.  Defendants, at all relevant times, did maintain complete and exclusive control over all aspects of the Policy.

58.     Pursuant to the Uniform Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201 – 2202, and Federal Rule of Civil Procedure 57, American National is entitled to a declaration from this Court that: (i) the Policy is void *ab initio* because it violates public policy, and therefore is of no force and effect and imposes no obligations upon American National, and that (ii)

American National may retain any and all premiums paid for the Policy due to Defendants' conduct. American National seeks all other available relief, including its attorneys' fees.

## COUNT II – DECLARATORY JUDGMENT
### (Void *Ab Initio,* Illegal Contract Procured in Violation of RICO)

59.     The allegations of the foregoing Paragraphs of this Complaint are realleged and incorporated as if set forth fully herein.

60.     It is a general and well-established rule in Tennessee that courts will not enforce a contract that violates public policy and that such power is "unquestioned and clearly necessary." *Baugh v. Novak*, 340 S.W.3d 372, 382 (Tenn. 2011).

61.     A contract in violation of a criminal statute is void and unenforceable. *Ledbetter v. Townsend*, 15 S.W.3d 462, 464 (Tenn. Ct. App. 1999) ("It is well settled that the courts of Tennessee will not enforce obligations arising out of a contract or transaction that is illegal.").

62.     The Policy is a contract procured in violation of certain state and federal criminal statutes. *See, e.g.*, Tenn. Code. Ann. § 39-12-204(b) ("It is unlawful for any person, through a pattern of racketeering activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, an interest in or control of any enterprise of real or personal property"); 18 U.S.C. § 1962(c) and (d).

63.     Pursuant to the Uniform Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201 – 2202, and Federal Rule of Civil Procedure 57, American National is entitled to a declaration from this Court that: (i) the Policy is void *ab initio* because it violates public policy, and therefore is of no force and effect and imposes no obligations upon American National, and (ii) American National may retain any and all premiums paid for the Policy due to Defendants' conduct. American National seeks all other available relief, including its attorneys' fees.

16

**COUNT III – VIOLATION OF RICO, 18 U.S.C. § 1962(c))**

64.     The allegations of the foregoing Paragraphs of this Complaint are realleged and incorporated as if set forth fully herein.

65.     The applicable elements of a civil RICO violation in this Circuit are: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (internal citations omitted).

66.     RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

67.     Defendants, by obtaining the Policy as part of the Conspiracy, have violated 18 U.S.C. § 1962(c), by participating or maintaining an interest, directly or indirectly, in the conduct of the affairs of an enterprise under 18 U.S.C. § 1961(4) through the commission of two or more acts constituting a "pattern" of "racketeering activity" affecting interstate or foreign commerce within the meaning of 18 U.S.C. § 1961(1).

68.     American National and each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

69.     The Policy was one procured and maintained as part of the Irish Traveler Insurance Conspiracy giving rise to the Criminal Case, to which New and several others pled guilty.

70.     RICO defines "racketeering activity" to mean "any act or threat involving" an enumerated list of offenses "which is chargeable under State law and punishable by imprisonment for more than one year" or "any act which is indictable under" an enumerated list of "provisions of title 18, United States Code." 18 U.S.C. § 1961(1).

17

71.     The predicate acts of racketeering activity in which Defendants engaged included violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1956 (Money Laundering), and 1957 (Monetary Transactions).

72.     Defendants committed predicate acts of wire fraud under 18 U.S.C. § 1343 by their conduct establishing each of the elements of wire fraud, i.e., (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud.

73.     Defendants committed predicate acts of mail fraud under 18 U.S.C. § 1341 by their conduct establishing each of the elements of mail fraud, i.e., (1) a scheme to defraud and (2) the use of the mails to execute that scheme.

74.     The scheme/conspiracy entailed the use of the mails to deliver false information to American National.

75.     A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter [i.e., October 15, 1970] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

76.     "[I]n order to prove such a 'pattern,' a civil RICO plaintiff also must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).

77.     A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "

78.     Defendants participated in and operated an unlawful enterprise by agreeing to submit false information to American National for the common purpose of procuring the Policy as a wagering contract, with the express intent that it would benefit Costello, and would be paid for, controlled by, and later transferred to Costello, an unrelated third party having no lawful, insurable interest.  The Enterprise engaged in interstate commerce.

79.     American National was injured by Defendants' conduct.  Defendants' actions have directly, illegally, and proximately caused injury to American National.

80.     American National has also suffered damages by incurring attorneys' fees and costs associated with Defendants' wrongful conduct.

81.     American National seeks an award of damages in compensation for administrative costs and other pecuniary injuries sustained by Defendants' misconduct. Pursuant to 18 U.S.C. § 1964(c), American National also seeks an award of three times the damages sustained and recovery of reasonable attorneys' fees and costs, as well as any other relief to which American National is entitled.

**COUNT IV – CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d))**

82.     The allegations of the foregoing Paragraphs of this Complaint are realleged and incorporated as if set forth fully herein.

83.     For the reasons discussed above, Defendants have conspired to commit a violation of civil RICO provisions under 18 U.S.C. § 1962(d) by participating, directly or indirectly, in the conduct of the affairs of an enterprise under 18 U.S.C. § 1961(4) which conspired to commit and did commit "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

84.     The predicate acts of racketeering activity in which Defendants engaged included violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1956 (Money Laundering), and 1957 (Monetary Transactions).

85.     American National seeks an award of damages in compensation for administrative costs and other pecuniary injuries sustained by Defendant's' misconduct. American National also seeks an award of three times the damages sustained and recovery of reasonable attorneys' fees and costs, as well as any other relief to which American National is entitled.

**COUNT V - FRAUD**

86.     The allegations of the foregoing Paragraphs of this Complaint are realleged and incorporated as if set forth fully herein.

87.     A cause of action for fraud requires (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation.

88.     Fraud is also actionable through the omission of material facts.

89.     Defendants knew the Application contained material misrepresentations related to the insured's annual income, net worth, and employment status at the time the Policy was applied for and at all times relevant while the policy was in effect. Defendants concocted a scheme to defraud American National by applying for life insurance through fraudulent application policies that fraudulently misrepresented insurable interests where none existed.

90.     Defendants acted under the guise of or in concert with the insured in applying for the Policy and knowingly and intentionally made or caused to be made false statements and misrepresentations to American National regarding the insured's financial status and the Defendants' relationship, and knowingly and intentionally concealed the true condition of the insured's health and Defendants' relationship from American National.

91.     Despite knowledge of the insured's financial status and relationship, Defendants continued to knowingly and intentionally make misrepresentations to American National throughout the duration of the Policy.

92.     American National issued the Policy based on the representations made or caused to be made by Defendants. But for the misrepresentations and falsities made or caused to be made by Defendants, American National would not have issued the Policy.

93.     Defendants knowingly and intentionally made or caused to be made the misrepresentations and falsities to American National with the intent American National would rely on the falsities and misrepresentations and issue the Policy. Defendants intended to unjustly profit from the proceeds of the Policy, obtained under fraudulent pretenses from American National.

94.     American National had no knowledge of the falsities and misrepresentations made or caused to be made by Defendants, nor did it have any reason to.

95.     American National acted in reliance on the falsities and misrepresentations made or caused to be made by Defendants in the Application and other documents submitted to American National.

96.     Defendants were under a duty to make truthful and complete representations to American National, which they knowingly and intentionally failed to do.

97.     As a consequent and proximate result of Defendants' misrepresentations and falsities, American National suffered injury by relying on such misrepresentations and falsities in issuing and administering the Policy, including costs necessary to bring this action.

**PRAYER FOR RELIEF**

WHEREFORE, American National respectfully requests that the Court permit American National's constructive tender of premium funds paid on the Policy, with interest, or, in the alternative, permit American National to deposit such into the registry of the Court. Upon final adjudication, American National asks that the Court find in its favor on all claims and enter a judgment:

a.   declaring that the Policy is void *ab initio* as obtained in violation of the rules preventing wagering contracts;

b.   declaring that the Policy is void *ab initio* as the product of RICO violations;

c.   holding that Defendants have violated RICO;

d.   holding that Defendants have conspired to violate RICO;

e.   holding that Defendants have committed fraud against American National; and

f.   awarding American National:

    i.   its actual damages;

    ii.   three times the amount of actual damages;

    iii.   its reasonable attorneys' fees and costs;

    iv.   pre- and post-judgment interest; and

    v.   all other relief to which American National is entitled, whether at equity or law.

Dated:  May 28, 2024.

s/ Buckner Wellford
Buckner Wellford (TN #09687)
Robert F. Tom (TN#26636)
Alex J. Hall (TN #34739)
Baker Donelson Bearman
  Caldwell & Berkowitz, PC
165 Madison Avenue, Suite 2000
Telephone: 901-577-2152
Facsimile: 901-577-0818
bwellford@bakerdonelson.com
rtom@bakerdonelson.com
ajhall@bakerdonelson.com

Angie Olalde (*pro hac vice* to be submitted)
Chelsi Honeycutt (*pro hac vice* to be submitted)
Greer, Herz & Adams, L.L.P.
1 Moody Plaza, 18th Fl.
Galveston, TX 77550
Telephone: (409) 797-3200
Facsimile: (866) 422-4406
aolalde@greerherz.com
choneycutt@greerherz.com

***Counsel for Plaintiff American National Insurance Company***